

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| ELAINE TRAHAN, Individually and on Behalf of All Others Similarly Situated, and VIRGINIA THOMAS, Individually and on Behalf of All Others Similarly Situated, | § § § § | |
| | § | |
| *Plaintiffs,* | § § | |
| v. | § | **CIVIL ACTION NO. 9:05-CV-29 (TH/KFG)** |
| | § | |
| LONG BEACH MORTGAGE COMPANY, ET AL., | § § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER ADOPTING
REPORT AND RECOMMENDATION AS MODIFIED AND
DENYING DEFENDANTS' MOTION TO DISMISS**

Before the Court is the *Amended Report and Recommendation of United States Magistrate on Motion to Dismiss* [Clerk's Docket No. 45] filed November 15, 2005. On November 30, 2005, defendants and the intervenor filed objections [Clerk's Docket No. 48] to the report and recommendation, to which plaintiffs filed a response [Clerk's Docket No. 51] on December 15, 2005. On January 10, 2006, defendants and the intervenor filed a reply brief [Clerk's Docket No. 58] and an amicus curiae brief [Clerk's Docket No. 57] was improperly[1] filed. Having considered the foregoing, the Court enters this

---

[1]  The amicus curiae brief was filed by five associations that represent financial institution engaged in home equity lending in the State of Texas.  At least two of the amici—Texas Bankers Association and Independent Bankers Association of Texas—took leading roles in lobbying efforts by financial institutions to bring home equity lending to the State of Texas. *See* Charles C. Boettcher, *Taking Home Equity for a*

memorandum opinion and order adopting the report and recommendation as modified herein and

denying the *Motion to Dismiss by Defendants Long Beach Mortgage Company and Washington Mutual Bank, FA*

[Clerk's Docket No. 6] filed March 29, 2005.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This litigation involves the constitutionality under Texas law of the variable rate feature

contained in home equity loans funded by defendant Long Beach Mortgage Company, serviced by

defendant Washington Mutual Bank and currently held by intervenor-defendant Long Beach Mortgage

Loan Trust 2004-2.   On November 13, 2003 and July 31, 2000, respectively, putative class

representatives Elaine Trahan and Virginia Thomas executed variable interest rate home equity loan

agreements.  *See Plaintiffs' First Amended Class Action Complaint for Declaratory Judgment, Injunctive Relief and*

---

*Walk, But Keeping it on a Short Leash*, 30 TEX. TECH. L. REV. 197, 222-23 (1999).  Because there is no general right of non-parties to be heard in pending litigation, it is incumbent on those seeking amicus status to request leave to appear whereby they demonstrate that their participation is both timely and useful.  *Liberty Lincoln Mercury v. Ford Mktg. Corp.*, 149 F.R.D. 65, 82 (D. N.J. 1993);  *United States v. Louisiana*, 751 F. Supp. 608, 620 (E.D. La. 1990).  "Historically, [an] amicus curiae is an impartial individual who . . . advises the Court in order that justice may be done, rather than to advocate a point of view so that a case may be won by one party or another."  *Community Ass'n for Restoration of the Env't (CARE) v. DeRuyter Bros. Dairy*, 54 F. Supp.2d 974, 975 (E.D. Wash. 1999).  "An amicus brief should normally be allowed when a party is not represented competently or is not represented at all, when the amicus has an interest in some other case that may be affected by the decision in the present case, or when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."  *Id.* When a court determines that the parties are already adequately represented or when an amicus curiae is perceived a partisan advocate for one of the parties to the litigation, leave to appear amicus should be denied.  *See Lincoln Mercury v. Ford Mktg. Corp.*, 149 F.R.D. at 82; *see also Yip v. Pagano*, 606 F. Supp. 1566, 1568 (D. N. J. 1985), *aff'd*, 782 F.2d 1033 (3rd Cir. 1986), *cert. denied*, 476 U.S. 1141 (1986)(leave to file amicus brief denied where participant is more accurately characterized as a friend of a party than friend of the court).  The privilege of being heard amicus rests solely within the discretion of the court and denial of permission to appear as an amicus curiae is not reviewable on appeal.  *United States v. Louisiana*, 751 F. Supp. at 620.

*Equitable Restitution* at 3-4 [Clerk's Docket No. 31].  The "calculation of changes"[2] provision contained in the notes allowed the lender to modify the payment amount by periodically adding 5.75% to the applicable financial index.  *Id.* at 4-5.  Plaintiffs contend this aspect of the notes runs afoul of the constitutional requirement that home equity loans be "scheduled to be repaid in substantially equal successive periodic installments."  TEX. CONST. art. XVI, § 50(a)(6)(L)(i).  As a result of the alleged constitutional infirmity, plaintiffs submit the liens are invalid and that all loan principal and interest is subject to forfeiture.  TEX. CONST. art. XVI, § 50(a)(6)(Q)(x).


On February 7, 2005, the *Original Class Action Complaint* [Clerk's Docket No. 1] was filed pursuant to this Court's diversity jurisdiction.  Although the civil action was initially assigned to the docket of U.S. District Judge Ron Clark, he transferred [Clerk's Docket No. 12] the case to the undersigned judge on April 11, 2005.  Following assignment to this Court's docket, all pretrial matters were referred to United States Magistrate Keith F. Giblin for disposition or recommendation.  28 U.S.C. § 636(b)(1)(A),(B),(C); FED. R. CIV. P. 72; LOCAL COURT RULES FOR THE EASTERN DISTRICT OF TEXAS (Appendix B, Rule 1(D)).

---

[2]  The "calculation of changes" provision reads as follows:

Each Change Date, the Note Holder will calculate my new interest rate by adding **FIVE and THREE/FOURTHS** percentage point(s) (**5.75%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal successive monthly payments, each of which will exceed the amount of accrued interest as of the date of the scheduled installment. The result of this calculation will be the new amount of my monthly payment.

*See Plaintiffs' First Amended Class Action Complaint Ex. C* [Clerk's Docket No. 31].

The recommendation now before this Court involves the *Motion to Dismiss by Defendants Long Beach Mortgage Company and Washington Mutual Bank, FA* [Clerk's Docket No. 6] filed March 29, 2005. Over the course of the four months after the motion to dismiss was filed, counsel extensively briefed the legal and factual issues before the Court in no less than eight submissions [Clerk's Docket Nos. 17, 18, 21, 25, 26, 33, 34, 35].  Oral argument on the propriety of dismissal was heard on two separate occasions [Clerk's Docket Nos. 22, 42].  On November 15, 2005, the magistrate judge entered an *Amended Report and Recommendation of United States Magistrate on Motion to Dismiss* [Clerk's Docket No. 45] in which he recommended that the motion to dismiss be denied.  The objections to the recommendation, plaintiffs' response to those objections and the reply have all been reviewed and considered by this Court.

## II.  LEGAL STANDARD – DISMISSAL FOR FAILURE TO STATE A CLAIM

"[A] complaint should not be dismissed for failure to state a claim unless is appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957); *see also* FED. R. CIV. P. 12(b)(6).  The purpose of a 12(b)(6) motion is to test the formal sufficiency of the complaint.  5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1356 (3d ed. 2005).  "[T]he motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *Id.*  The fundamental question before the court at the 12(b)(6) juncture is whether plaintiffs have stated a cognizable legal theory that is supported by sufficient factual allegations. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

The movant bears the burden of proof on a motion seeking dismissal. *Bangura v. Hansen*, 434 F.3d 487, 2006 WL 119139 (6th Cir. 2006). Extrinsic evidence is not considered, and the district court's inquiry is limited to the facts alleged in the complaint, documents attached to or incorporated in the complaint, documents attached to a motion to dismiss that are referenced in and central to the complaint, matters of public record, and matters of which the court may take judicial notice. *See Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 570 n. 2 (5th Cir. 2005); *see also Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1995).

Several well settled principles guide the Court's inquiry into the sufficiency of a complaint. When considering a motion to dismiss, the court must assume the truth of the "material" or "well-pleaded" facts alleged in the complaint. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 125 S. Ct. 1497, 1502-03 (2005); *Woodward v. Andrus,* 419 F.3d 348, 351(5th Cir. 2005). The complaint is to be construed liberally, and all reasonable inferences are to be drawn in the light most favorable to the plaintiff. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 548 (5th Cir. 2005). In passing on the sufficiency of the complaint, the court should bear in mind that the federal rules contemplate notice pleading, requiring that the complaint do no more than "recite a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *General Elec. Capital Corp. v. Posey*, 415 F.3d 391, 396 (5th Cir. 2005).

Rule 12(b)(6) does not countenance dismissal of an action merely because the court believes the plaintiff is unlikely to prevail on the merits. *United States v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). "Even if it seems almost a certainty to the court that the facts alleged cannot be proved to support the legal claim, the claim may not be dismissed so long as the complaint states a claim." *Id.*

"The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim." *Great Plains Trust  v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002).

"Motions to dismiss are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., v. Singh*, 428 F.3d at 570 (*quoting Shipp v. McMahon*, 199 F.3d 256, 260 (5th Cir. 2000)); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  Dismissals "should be granted sparingly and with caution to make certain that the plaintiff is not improperly denied a right to have [the] claim adjudicated on the merits."  5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1349.  District courts should be especially reluctant to dismiss on the basis of pleadings alone when the asserted theory of liability is novel, since it is important that new legal theories be explored in the light of actual facts.  *Id.* at § 1357.  The Fifth Circuit has embraced this view and has cautioned against dismissal of novel legal theories on the basis of bare-bones pleadings.  *See Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981); *see also Shull v. Pilot Life Ins. Co.*, 313 F.2d 445, 447 (5th Cir. 1963).

Taking all these considerations into account, a 12(b)(6) dismissal is only appropriate where the movant has demonstrated  "that no relief could be granted under any set of facts that could be proved consistent with the allegations.'"  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992, 998 (2002).  Mindful of this standard, the Court now considers the applicable historical and legal background giving rise to the plaintiffs' claims.

# III.  LEGAL BACKGROUND

A.    <u>Historical Development of the Homestead Protection</u>

Generally speaking, homestead protections limit the types of financial obligations that can force an involuntary sale of the home to satisfy debts.  Originating on the Mexican-Texas frontier, this concept was first written into law by the Mexican state of Coahuila y Texas in 1829.  *See* Joseph W. McKnight, *Protection of the Family Home From Seizure By Creditors: The Sources and Evolution of a Legal Principle*, 86 SOUTHWESTERN HISTORICAL QUARTERLY 369 (1983).  Inspired by  Hispano-Mexican civil law antecedents dating back centuries, the homestead protection did not exist in the English common law tradition. *Id.*

After securing independence from Mexico, the Republic of Texas codified laws recognizing the homestead exemption.  *See Johnson v. Comm'r of Internal Revenue*, 718 F.2d 1303, 1307 (5th Cir. 1983). While the majority of states in this country would eventually recognize some degree of homestead protection, the State of Texas has the distinction of being the first to incorporate a homestead exemption into American jurisprudence when it joined the Union in 1845.  *See* TEX. CONST. OF 1845, art. VII, § 22;  *England v. Fed. Deposit Ins. Corp.*, 975 F.2d 1168, 1172 (5th Cir. 1992).  Homestead protections were thereafter carried forward in subsequently adopted Texas constitutions in 1861, 1866, 1869, and 1876 and supplemented by legislative enactments.  *See* TEX. CONST. art. XVI, § 50 cmt. (1993).  Texas remains today among the states most protective of the home.  *See* Julia Patterson Forrester, *Home Equity Loans in Texas: Maintaining the Texas Tradition of Homestead Protection*, 55 S.M.U. L. REV. 157, 174 (2002).

Many explanations have been given for the enactment and expansion of strong homestead protections in the State of Texas. Such laws were more than just paternalistic efforts to protect individual debtors from the misery of destitution and the rapacity of unscrupulous creditors. *See Johnson v. Comm'r of Internal Revenue*, 718 F.2d at 1307. Because the protection and security of the entire family was of paramount concern in the adoption of these laws, the homestead right inures to the benefit of the family as a whole and to each family member residing therein. *See Williams v. Jenkins,* 25 Tex. 279, 1860 WL 5835 *11 (Tex. 1860); *see also Woods v. Alvarado State Bank*, 118 Tex. 586, 595, 19 S.W.2d 35, 38 (Tex. 1929); *see also Garrard v. Henderson*, 209 S.W.2d 225, 229-30 (Tex. Civ. App.—Dallas 1948, no writ). At its most basic level, the homestead protection embodies a recognition of the fundamental human need for shelter. *Wood v. Wheeler*, 7 Tex. 13, 1851 WL 4031 *8 (Tex. 1851)(describing homestead as an asylum and refuge)*; see also In re Neale,* 274 F. Supp. 969, 973 (N.D. Tex. 1967). As a matter of public policy, such laws contribute to the stability and welfare of the state by both decreasing the risk of indigency and enabling citizens to remain productive members of society. *Williams v. Williams*, 569 S.W.2d at 874; *Johnson v. Comm'r of Internal Revenue*, 718 F.2d at 1307.

The homestead protection commands unusual deference and is considered a "favorite" of the law. *In re Norris*, 413 F.3d 526, 528 (5th Cir. 2005). Courts have been admonished to give liberal construction to the constitutional and statutory provisions that protect the homestead. *Id.*; *Woods v. Alvarado State Bank*, 118 Tex. at 589-90; *Rooms With a View, Inc. v. Private Nat'l Mortgage Ass'n*, 7 S.W.3d 840, 849 (Tex. App.—Austin 1999, pet. denied). As a result, it has been said that Texas courts have jealously protected the cherished homestead rights that vest in Texas citizens. *In re Moody*, 77 B.R. 580, 597 (S.D. Texas 1987).

B.       Home Equity Lending in Texas

It was with the adoption of the current Texas constitution in 1876 that the legislature expressly limited to three the types of liens that can force an involuntary sale of the home:  purchase money loans, home improvement loans and taxes due on the home.  TEX. CONST. art. XVI, § 50(a).  By invalidating[3] all other liens, this provision had the practical—if not intended—effect of eliminating the development of a Texas home equity lending market for well over 100 years.

This would change when the campaign to authorize home equity lending proved successful during the 1997 legislative session.  The state's electorate passed the amendment authorizing such encumbrances, and home equity lending commenced on January 1, 1998.  Incidentally, the decade beginning in 1995 bore witness to the largest erosion of the homestead protection heretofore enjoyed by Texas citizens.  For over 150 years the liens that could force an involuntary sale of the homestead had remained constant at three; since 1995, five more exceptions to the homestead protection have been added, bringing to eight the types of liens with the potential to force a homestead sale.

This litigation involves one of those newly recognized encumbrances with the power to force an involuntary sale: the home equity lien.  The home equity provision found in the constitution "establishes the terms and conditions a home-equity lender must satisfy to make a valid loan." *Stringer v. Cendant Mortgage Corp.*, 23 S.W.3d 353, 356 (Tex. 2000); TEX. CONST. art. XVI, § 50(a)(6)(A)-(Q).  Put another way, "[t]he Constitution defines a home-equity loan by the requirements that are imposed upon

---

[3]  "No mortgage, trust, deed or other lien on the homestead shall ever be valid."  TEX. CONST. art. XVI, § 50.

the lender in making a home-equity loan." *Adams v. Ameriquest Mortgage*, 307 B.R. 549, 553 (Bankr. N.D. Tex. 2004).

No doubt due to the state's long-standing hostility toward liens on the home, the  constitution contains a veritable laundry list of restrictions for a valid home equity lien to attach to the homestead. Tex. Const. art. XVI, § 50(a)(6)(A-Q).  These requirements are "for the most part designed to protect homeowners from unscrupulous lenders or from the consequences of a bad decision."  *See* Julia Patterson Forrester, *Home Equity Loans in Texas: Maintaining the Texas Tradition of Homestead Protection*, 55 S.M.U. L. Rev. 157, 165 (2002).  Dubbed the "armored car of home equity lending," the amendment includes consumer safeguards addressing, *inter alia*, the form of the note, the amount of the loan, security for the loan, a cap on the fees that may be permissibly charged, a bar on penalty for loan pre-payment, limitations on the number of loans, waiting periods, acceptable lenders, and—of particular importance to this case—the scheduling and amount of installment payments. *See* Charles C. Boettcher, *Taking Home Equity for a Walk, But Keeping it on a Short Leash*, 30 Tex. Tech. L. Rev. 197 (1999).

"If these requirements are not met, the lien against the homestead is not valid and the loan is treated as unsecured as to the homestead property."  *Adams v. Ameriquest Mortgage*, 307 B.R. at 553 (*citing Doody v. Ameriquest*, 49 S.W.3d 342, 345-46 (Tex. 2001)).  If the lien is held invalid for non-compliance with a constitutional requirement, it is voided, the borrower is not personally liable, and the lender is left without personal recourse. *Id.*  All principal and interest of the extension of credit is forfeited.  Tex. Const. art. XVI, § 50(a)(6)(Q)(x).  "This is a risk that lenders face in the home-equity loan arena."  *Adams v. Ameriquest Mortgage*, 307 B.R. at 553 (*citing Doody v. Ameriquest*, 49 S.W.3d 342, 345-46 (Tex. 2001)).

C.      Home Equity Provision Subsections at Issue

This litigation involves the interplay between two subsections of the constitutional home equity provision.  The relevant portions of the two subsections are excerpted below:

> [The extension of credit for a home equity loan must be] scheduled to be repaid in *substantially equal successive periodic installments*, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment.
> TEX. CONST. art. XVI, § 50(a)(6)(L)(i) (emphasis added).

> [This amendment] permits a lender to contract for and receive any fixed or variable rate of interest authorized under statute.
> TEX. CONST. art. XVI, § 50(a)(6)(O).

Many have questioned the wisdom of placing every detail of the home equity provision in the constitution, suggesting that a better course would have been to pass enabling legislation after the constitution was amended.  *See* Julia Patterson Forrester, *Home Equity Loans in Texas: Maintaining the Texas Tradition of Homestead Protection*, 55 S.M.U. L. REV. 157, 169-172 (2002); *see also* Charles C. Boettcher, *Taking Home Equity for a Walk, But Keeping it on a Short Leash*, 30 TEX. TECH. L. REV. 197, 222-23 (1999).  In light of the amendment's length, detail and complexity, it is not surprising that even before the home equity provision took effect, questions of interpretation were propounded upon various state agencies with lending oversight.

As a result, less than one week after Texas officially entered the home equity lending market on

January 1, 1998, four[4] state departments jointly issued a *Regulatory Commentary on Equity and Lending Procedures*, which was updated approximately ten months later.  Due to the absence of enabling legislation conferring constitutional interpretative authority upon the legislature, this effort to clarify the home equity provision was of questionable assistance.  The commentary implicitly acknowledged as much by opening with this observation:

> The fact that most of the provisions regarding implementation of home equity lending reside in the constitution creates a dilemma for providing interpretations of particular provisions.  Inherent in an issue as complex as home equity are details that simply cannot be fully addressed within the text of the amendment.

*See Regulatory Commentary on Equity and Lending Procedures* at 1 (October 7, 1998).  Explicitly recognizing its non-binding effect, the commentary went on to provide an advisory opinion as to how a loan could have a variable rate of interest and also be scheduled for repayment in  "substantially equal successive periodic installments":

> The authorization of a variable interest rate is ambiguous when read in connection with the provision relating to substantially equal successive monthly installments.  In construing the constitution, provisions are viewed broadly giving maximum effect to all sections and phrases.  Thus, an equity loan providing in accordance with applicable law for an interest rate that varies from time to time may provide for a payment amount that varies from time to time, assuming that the loan is regularly amortizing and that the rate adjusts on a regular basis, such as annually.  The amount of the payment should not change more frequently than the interest rate adjustment.  The scheduled payment amount between each payment change date should be substantially equal and the amount of the payment should equal or exceed the amount of interest scheduled to accrue between each payment date.  An adjustable rate loan may provide for discount interest that results in a low initial interest rate.  An equity loan must be structured in a way such that the transaction regularly amortizes, contributes to amortization of principal, and does not result in a balloon payment.

---

[4]  The commentary was issued by the Office of Consumer Credit Commissioner, the Department of Banking, the Savings and Loan Department, and the Credit Union Department.

*See Regulatory Commentary on Equity Lending Procedures* at 1, 8 (October 7, 1998).  These departments quite boldly took it upon themselves to interpret what they characterized to be a facially ambiguous interaction between two subsections of the Texas Constitution.  They concluded that the amount of the scheduled payments could change with interest rate adjustments so long as the scheduled payments between each adjustment were substantially the same.  At first blush, this construction appears to conflict with the plain wording of the constitution to the extent it requires loans to be scheduled for repayment in "substantially equal successive periodic installments."

Soon thereafter, the Texas Attorney General issued an opinion clarifying that no state agency had the authority to construe amendments to the state constitution.  *See Tex. Atty. Gen. Op. DM-495,* 1998 WL 903477 *1 (December 21, 1998).  Addressed to one of the legislative sponsors of the home equity provision, the Texas Attorney General responded as follows:

> Your particular question is whether the legislature may legally authorize and empower a state agency to construe and interpret the provisions of section 50 of the Texas Constitution as it now stands.  The answer to your question, strictly read, is no.  The Legislature has no authority to interpret or declare a matter of constitutional construction, nor may it delegate such authority to an administrative agency.  To do so, absent express constitutional authorization, would be to usurp the powers of the judiciary in violation of the separation of powers principles set out in article II, section 1 of the Texas Constitution . . . .
>
> *                *                *
>
> [A]s section 50 now stands, neither the legislature nor any state agency has the power to declare definitively what it means. The ultimate power to construe constitutional provisions lies solely with the courts.

*Id.*  Perhaps as a result of the Attorney General's opinion, the *Regulatory Commentary on Equity and Lending Procedures* was not formally indexed so as to gain force of law.  *See* TEX. GOVT CODE § 2001.005(a) ("a state agency rule, order, or decision made or issued on or after January 1, 1976 is not valid or effective

-13-

against a person or party, and may not be invoked by an agency, until the agency has indexed the rule, order, or decision").

The Attorney General's opinion comports with a recent holding of the Texas Supreme Court regarding the scope of authority enjoyed by state agencies:

> [A]dministrative agencies may exercise only those powers the law, in clear and express statutory language, confers upon them.  Courts will not imply additional authority to agencies, nor may agencies create for themselves any excess powers.

*Subaru of America v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 220 (Tex. 2002).  As an entity wholly owing it existence to the legislature, a state agency only enjoys authority over those matters expressly and validly delegated thereto.  *Texas Advocates Supporting Kids v. Texas Educ. Agency*, 112 S.W.3d 234, 238 (Tex. App.—Austin 2003, no pet.).  "An agency may not . . . exercise what is effectively a new power on the theory that such exercise is expedient for the agency's purposes."  *Id.*  As an attempt to interpret the Texas constitution, the Attorney General found the 1998 commentary lacking in two respects: first, the legislature *had not* expressly delegated to any state agency interpretative authority regarding the home equity provision, and second, even if a delegation could be implied, the legislature itself lacked power to construe the state constitution and therefore it *could not* delegate such authority to any state agency.

As one legal commentator noted, the 1998 commentary "is not a safe harbor for lenders."  *See* Charles C. Boettcher, *Taking Home Equity for a Walk, But Keeping it on a Short Leash*, 30 Tex. Tech. L. Rev. 197, 223 (1999).  "If provisions of the home equity amendment are litigated, courts do not have to defer to the Regulatory Commentary."  *Id.*  As such, "the commentary actually does little more than offer lenders some possible arguments in court."  *Id.*

It was for this reason that it was necessary to amend section 50 of the state constitution  once

again in 2003.  This amendment empowered the state legislature to delegate to one or more state

agencies authority to interpret the portion of the constitution governing home equity lending.  *See* TEX.

CONST. art. XVI, § 50(a)(u).  Through subsequent enactment, the legislature delegated this authority to

the Finance Commission[5] and the Credit Union Commission.  *See* TEX. FIN. CODE §§ 11.308, 15.413.

It was also with this 2003 amendment that the so-called lender safe harbor provision was added to the

constitution, which provides:

> An act or omission does not violate a provision included in those subsections if the act
> or omission conforms to an interpretation of the provision that is:
>
> (1)      in effect at the time of the act or omission; and
> (2)      made by a state agency to which the power of interpretation is
>          delegated as provided by this subsection or by an appellate court of
>          this state or the United States.

*See* TEX. CONST. art. XVI, § 50(a)(u).

With their now-legitimate authority to promulgate interpretive rules, the Finance and Credit

Union Commissions issued interpretations which were codified and became effective January 8, 2004.

*See* 7 TEX. ADMIN. CODE § 153.1 *et seq*.  Among these newly enacted rules was one of particular

importance to this case, which the parties and magistrate judge have referred to in the court papers as

the home equity rule.  *See* 7 TEX. ADMIN. CODE § 153.16.  The 2004 home equity rule provides that:

> A lender may contract for and receive any fixed or variable rate of interest authorized
> under statute.

---

[5]  The Finance Commission is the oversight body for the Department of Banking, the Department
of Savings and Mortgage Lending, and the Office of the Consumer Credit Commissioner.  *See Homepage for the
Finance Commission of Texas*, http://www.fc.state/tx.us.

\*       \*       \*

The scheduled installment amounts of a variable rate equity loan must be:

> *substantially equal between each interest rate adjustment*; and

> sufficient to cover at least the amount of interest scheduled to accrue
> between each payment date and a portion of the principal.

An equity loan agreement may contain an adjustable rate of interest that provides a
maximum fixed rate of interest pursuant to a schedule of steps or tiered rates or
provides a lower initial interest rate through the use of a discounted rate at the
beginning of the loan.

7 TEX. ADMIN. CODE § 153.16(3-4)(emphasis added).


## IV.  ANALYSIS OF THE OBJECTIONS TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE


A.    Introduction


The magistrate judge has made a recommendation to this Court that the *Motion to Dismiss by Defendants Long Beach Mortgage Company and Washington Mutual Bank, FA* [Clerk's Docket No. 6] filed March 29, 2005 be denied.  After undertaking a thorough analysis of the various issues raised, Judge Giblin determined that plaintiffs have stated a claim for recovery sufficient to withstand 12(b)(6) scrutiny.  Specifically, he found that plaintiffs had stated a cognizable legal claim that the notes violated the constitutional requirement that home equity loans be scheduled for repayment in "substantially equal successive periodic installments."  TEX. CONST. art. XVI § 50(a)(6)(L)(i).  He also found that this claim for relief was supported by sufficient factual allegations.

B.      Standard of Review


The Court begins by observing that it is only incumbent upon this Court to make a *de novo* review of those portions of the report and recommendation to which defendants and intervenor properly and timely raised objections.  28 U.S.C. § 636(b)(1)(C);  FED. R. CIV. P. 72(b); LOCAL COURT RULES FOR THE EASTERN DISTRICT OF TEXAS (Appendix B, Rule 4(B)).  With respect to those portions of the report and recommendation to which no objections were raised, the Court need only satisfy itself that there is no plain error[6] on the face of the record.  *See Douglas v. United Serv. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(*en banc*).


C.      First Objection: Misapplication of the Rule 12(b)(6) Legal Standard


The first objection to the report is that the magistrate judge improperly applied the Rule 12(b)(6) standard.  *See Objections to the Report and Recommendation* at 7-10 [Clerk's Docket No. 48].  To the extent the 12(b)(b) legal methodology was misstated, the Court modifies the report and substitutes the legal standard enunciated herein.  Under this formulation, the Court finds that defendants and intervenor have not met their burden of demonstrating "that no relief could be granted under any set of facts that could be proved consistent with the allegations.'"  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992, 998 (2002).


In finding that plaintiffs have pled commensurate with the standard required to withstand  Rule

---

[6]  Under plain error review, the court corrects errors that are "plain, affect substantial rights, and seriously affect the fairness, integrity or public reputation of judicial proceedings."  *Price v. San Antonio*, 431 F.3d 890, 894 (5th Cir. 2005).

12(b)(6) scrutiny, this Court has only taken into account and assumed the truth of those "material" and "well-pleaded" facts alleged.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 125 S. Ct. 1497, 1502-03 (2005); *Woodward v. Andrus,* 419 F.3d 348, 351 (5th Cir. 2005).  This Court is well aware that plaintiffs' legal conclusions need not be accepted as true, and in adopting the recommendation to deny the motion to dismiss have not done so.  Even so, "[t]he mere fact that allegations can be characterized as 'conclusional' will not, alone, suffice to make them insufficient."  *General Elec. Capital Corp, v. Posey*, 415 F.3d 391, 397 n. 6 (5th Cir. 2005).  "Instead, the test is whether the complaint outlines or adumbrates a violation of the statute, common law theory of recovery or constitutional provision on which the plaintiff relies . . . and connects the violation to the named defendants."  *Id.*  In finding that the complaint does so, it is not necessary for the Court to speculate as to facts not actually pled, and to the extent the recommendation suggests reliance thereon, it is hereby modified.

The Court also modifies the recommendation to the extent it leaves an impression that the magistrate judge reached the merits of plaintiffs' claims in the course of considering the dismissal for failure to state a claim.  At this stage of the proceedings it is not necessary to decide what in fact is constitutionally permissible, whether the terms of the notes pass constitutional muster, whether the regulatory commentary and/or subsequently codified agency rules control this dispute, or whether and to what extent the plaintiffs' scheduled payments can fluctuate over the life of the loan.  These determinations are not appropriate for consideration at the 12(b)(6) stage and must be saved for another day.  *See* 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1356 ("the motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case").

D.    Second Objection: Dismissal Should Be Granted Under Proper Interpretation of the Home
      Equity Provision of the Texas Constitution


      The second objection to the report and recommendation is that the magistrate judge incorrectly

construed the Texas constitution.  *See Objections to the Report and Recommendation* at 11-18 [Clerk's Docket

No. 48].  This objection is overruled as it seeks to have the Court prematurely reach the merits of

plaintiffs' case.  The proper focus of the Court's attention at this stage relates to whether plaintiffs have

stated a cognizable legal theory that is supported by sufficient allegations.  *Balistreri v. Pacifica Police Dep't*,

901 F.2d 696, 699 (9th Cir. 1990).  Having found they have done so, the Court declines the

impermissible effort by defendants and intervenor to engage the Court in a discussion of the case's

substantive merits.


E.    Third Objection:  Effect of the 1998 *Regulatory Commentary on Equity and Lending Procedures*


      An objection has also been lodged that the 1998 commentary  precludes maintenance of

plaintiffs' action.  *See Objections to the Report and Recommendation* at 18-22  [Clerk's Docket No. 48].  For

several reasons, this is not a cogent argument in support of dismissal.  First, "[i]t is not at the pleading

stage that the FEDERAL RULES OF CIVIL PROCEDURE contemplate that a determination will be made

as to the applicability of various legal theories to a claim for relief stated in the complaint."  *Goldstein v.

North Jersey Trust Co.*, 39 F.R.D. 363, 367 (S.D. N.Y. 1966).  Second, there is a question as to whether

it is proper to take the commentary into account given that extrinsic evidence is not considered at the

12(b)(6) stage. *See Test Masters Edu. Servs., Inc. v. Singh*, 428 F.3d 559, 570 n. 2 (5th Cir. 2005); *see also

Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1995).  As previously stated, this Court's

inquiry is limited to the facts alleged in the complaint, documents attached to or incorporated in the

complaint, documents attached to a motion to dismiss that are referenced in and central to the plaintiff's complaint, matters of public record, and matters of which the court has taken judicial notice.  *Id.*  The commentary does not appear to fall into any of these categories.  Third, even if the Court were inclined to take the commentary into consideration, there is a serious question as to its persuasive authority given that the Texas Attorney General determined that no state agency had the power to interpret the constitution when the commentary was issued.  *See Tex. Atty. Gen. Op. DM-495*, 1998 WL 903477 *1 (December 21, 1998).  In their efforts to convince the Court the 1998 commentary controls, defendants and intervenor cite *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842-843, 104 S. Ct. 2778, 2781-82 (1984).  *See Objections to the Report and Recommendation* at 20-21  [Clerk's Docket No. 48] ("*Chevron* demands that the 1998 guidelines . . . be considered" in construing the constitution).  However, *Chevron* deference is "warranted only 'when it appears that [the legislative body] delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'"  *Gonzales v. Oregon*, ___ U.S. ___, 126 S. Ct. 904, 914-15 (2006).  It is also worth noting that the validity of the commentary is questionable given that it was not indexed pursuant to section  2001.005(a) of the TEXAS GOVERNMENT CODE.  This is not to say that the Court may not later determine that the commentary is entitled to some degree of weight, it is just that this will have to be decided after engaging in a more robust dialogue regarding the validity and persuasive effect of the commentary.  For all of the foregoing, the 1998 commentary cannot serve as a vehicle to dismiss plaintiffs from court.

F.      Fourth Objection: Effect of the 2004 Home Equity Rule

        The fourth objection to the report and recommendation is that the magistrate erred in not

construing the constitution in accordance with the 2004 home equity rule.  *See Objections to the Report and Recommendation* at 22-25 [Clerk's Docket No. 48].  Disposition of the plaintiffs' case in light of the 2004 home equity rule is not appropriate because it goes to the merits of the case and requires the Court to rely upon evidence outside the complaint.  Further, whether and the degree to which the rule applies to the claims at bar is yet to be established given that the putative class definition encompasses notes executed between January 1, 1998 and December 31, 2003—a period of time before which the rule took effect.  Given that the Attorney General found the agencies lacked authority to interpret the constitution prior to the 2003 amendments, the Court is at a loss as to how defendants and intervenor can characterize the 2004 home equity rule as "simply a clarification of existing law" such that it should be applied retroactively.  *See Objections to the Report and Recommendation* at 19 [Clerk's Docket No. 48].  Finally, assuming the rule does in fact appertain to the plaintiffs' claims, the Court would need to consider whether it is necessary to resort to agency interpretations given the plain wording of the Texas constitution.  *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S. Ct. 2778, 2782 n. 9 (1984)(court must give effect to intent where it can be ascertained employing traditional tools of construction). As such, the 2004 home equity rule does not dictate dismissal of plaintiffs' case.

G.      Fifth Objection: Dismissal Should Be Granted Because Texas Law Disfavors Forfeiture
        Provisions

        In their fifth objection, the defendants and intervenor aver that the magistrate failed to construe the claims with the requisite degree of scrutiny required where forfeiture is a potential remedy.  *See Objections to the Report and Recommendation* at 25-27 [Clerk's Docket No. 48].   At this stage of the proceeding, the focus is not on the imposition of penalties, but rather whether plaintiffs have stated a cognizable legal claim supported by sufficient facts.  Given that the Court has not reached the merits

of the case, consideration of the appropriate remedy, if any, is not appropriate at this juncture. Moreover, "[i]t need not appear that the plaintiff can obtain the specific relief demanded as long as the court can ascertain from the face of the complaint that some relief can be granted." *Doe v. United States Dep't of Justice*, 735 F.2d 1092, 365-366 (D.C. Cir. 1985).  It is for this reason that "[a] district court should not grant a Rule 12(b)(6) motion to dismiss for failure to seek the technically appropriate remedy when the availability of some relief is readily apparent on the face of the complaint." *Id.* at 366.

## IV.  ORDER

**IT IS THEREFORE ORDERED** that the *Report and Recommendation of United States Magistrate on Motion to Dismiss* [Clerk's Docket No. 45] is hereby **ADOPTED AS MODIFIED HEREIN**.

**IT IS FURTHER ORDERED** that the *Motion to Dismiss by Defendants Long Beach Mortgage Company and Washington Mutual Bank, FA* [Clerk's Docket No. 6] is in all things **DENIED**.

**IT IS FURTHER ORDERED** that a conference to address class certification scheduling issues is hereby **SET** for Friday, February 17, 2006 at 10:00 a.m.  In preparation therefor, counsel is directed to confer and if at all possible submit an agreed scheduling order no later than February 15, 2006.

**SO ORDERED.**

**SIGNED** this the **9**  day of **February, 2006.**

Thad Heartfield
United States District Judge